CASENAVE, PETITIONER AND APPELLEE, *v.* GUZMÁN, RESPONDENT AND APPELLANT.

APPEAL from the District Court of San Juan, Section 1, in Mandamus Proceedings.

No. 1281.—Decided July 30, 1915.

NOTARIAL PROTOCOLS—PUBLIC INSPECTION OF PROTOCOLS.—Considering both the Spanish and English texts of General Orders No. 150 of September 26, 1899, and No. 177 of November 11, 1899, in relation to General Order No. 8 of January 16, 1900, it was not the intention of the Military Government to establish the right to inspect notarial protocols or deprive them of the private and secret character given them by statute and by the Organic Notarial Regulations then in force.

The facts are stated in the opinion.

The appellant appeared *pro se.*

*Messrs. Rafael López Landrón* and *Juan Gregory* for the appellee.

MR. CHIEF JUSTICE HERNÁNDEZ delivered the opinion of the court.

On January 4, 1915, José María Casenave y García de Orozco presented a verified petition to the Judge of the District Court of San Juan, Section 1, praying that a peremptory or, if not, an alternative writ of mandamus issue to Notary Juan de Guzmán Benítez commanding him to produce and exhibit for examination or inspection by the petitioner the original draft of open will No. 163 executed on November 2, 1914, by Isabel Márquez y Crosas, whose collateral relative by consanguinity the petitioner claims to be and as such with a lawful interest in any intestate estate which

the said Isabel Márquez might leave, as she has no ascendants or descendants.

After hearing the respondent the court, by an order of January 18, 1915, issued the peremptory writ of mandamus prayed for, from which order the respondent took the present appeal.

The petitioner bases his claim on section 1 of General Military Order No. 150 of September 26, 1899, which is explained and amplified by Order No. 177 of November 11, 1899, and which, in his opinion, has not been repealed expressly or impliedly by any subsequent statute.

General Order No. 150 provides:

"I. *En adelante los archivos de todos los tribunales, magistraturas, notarías, registros, municipios y demás oficinas públicas, estarán accesibles a la inspección del público, durante las horas de despacho.*

"II. *Todos los funcionarios o guardianes encargados de dichos archivos facilitarán copias legalizadas de los mismos a cualquiera que las solicitare, mediante el pago de los siguientes derechos:*

"*Por cada folio de traslado de un expediente_____ 15 cent. m. americana.*

"*Por cada legalización de un traslado_____ 25 cent. m. americana.*"

The English text reads as follows:

"I. Hereafter the records of all courts, magistrates, notaries, registrars, municipalities, and other public offices, shall be open to the inspection of the public during office hours.

"II. All officers or custodians in charge of such records, shall furnish officially certified copies thereof to any person who may make application therefor upon payment of the following fees:

"For each folio of transcript of a record_____ $0.15 American currency.

"For each official certification of a transcript_____ $0.25 American currency."

General Order No. 177, explaining the above, is as follows:

"*La palabra 'records' empleada en la Orden General No. 150, serie corriente, de este Cuartel General, así como su traducción*

*'archivos'* *en* *la* *versión* *castellana,* *deberá* *.entenderse* *que* *incluye* *toda* *clase* *de* *expedientes* *que* *directa* *o* *indirectamente* *se* *relacionen* *con* *cualquier* *asunto* *cuya* *documentación* *deba* *·archivarse,* *ya* *esté* *terminado* *o* *pendiente* *de* *resolución."*

The English text of General Order No. 177 reads:

"The word 'records' as used in General Orders No. 150, current series, these headquarters, and translated in the Spanish copy as *'archivos,'* is intended to include all documents (*expendientes*) of every character which are connected with or relate to any case of record whether concluded or still pending."

The literal translation of the English version of Order No. 177 into Spanish is the following:

*"La* *palabra* *'records,'* *según* *está* *usada* *en* *la* *Orden* *General* *No.* *150,* *serie* *corriente,* *de* *este* *Cuartel* *General,* *y* *traducida* *al* *texto* *español* *por* *la* *·de* *'archivos,'* *es* *entendido* *que* *incluye* *todos* *los* *docu-* *mentos* (*expedientes*) *de* *cualquier* *·carácter,* *que* *tengan* *conexión* *o* *relación.con* *cualquier* *caso* *de* record, *esté* *concluido* *o* *aun* *pendiente."*

The English text of General Order No. 177 gives the real meaning of the word "records," as used in General Order No. 150. The records to which the latter refers include all documents of whatever character which are connected with or relate to any case of record, whether concluded or still pending.

It is apparent that the instruments of a protocol cannot be said to be connected with or to relate to any case of record concluded or pending.

Therefore, we are of the opinion that, following either the English or the Spanish text, it was not the intention of the Military Government to establish the right to inspect notarial protocols.

Such a right was not recognized by the Spanish notarial law formerly in force and promulgated in this island by a Royal Decree of October 29, 1873. Section 32 of the same pro-vides, among other things, as follows:

"Neither shall notaries permit any documents to be taken from their archives which are under their charge by reason of their office, nor shall they permit it or the protocol to be examined, in whole or in part, without a previous judicial decree, except by the interested persons who have an acquired right, or their heirs or legal representatives. However, in the cases determined by law and by virtue of a judicial mandate they shall exhibit in their archives the protocol or protocols, in order to attend by virtue thereof to the proceedings that may have been agreed upon."

If it had been the intention of the Military Government to divest protocols of their private or secret character, as recognized by article 47 of the Organic Notarial Regulations, it would have so stated expressly without leaving any doubt. It must be admitted that General Order No. 150, after being explained by Order No. 177, left this right of inspection very doubtful, at least, and in case of doubt there can be no repeal of a prior statute which is plain and unambiguous. Nor does General Order No. 150 contain the repealing clause which is customary when new rights are created which are in conflict with former statutes. It seems to us that the military authority, which was then clothed with legislative power, did not intend to establish so radical a reform as that under consideration concerning notarial protocols and that if it had had such intention its language would have been more specific.

Moreover, General Order No. 8 of January 16, 1900, reads as follows:

"The provisions of General Orders No. 150 as amended by General Orders, No. 177, and General Orders, No. 198, series of 1899, these headquarters, are intended to apply only to official copies of documents on file in public offices as therein indicated, and to official certificates of the same, and are not to be construed as a revocation of the existing notarial tariff as modified by General Orders, No. 11, series of 1899, these headquarters, and as published in the Official Gazette of February 1, 1899."

We have already referred to General Orders Nos. 150 and 177. General Order No. 198 provides, among other things,

that the fees collected for transcripts of official records and official certificates of such transcripts shall be evidenced by revenue stamps, which shall be affixed to each document so certified.

As may be seen, General Order No. 8 makes it plain that although section 2 of General Order No. 150 fixes the fees to be collected by officers or custodians in charge of the records referred to in section 1 for certified copies of such records, the intention was that the provision should apply only to official copies of documents on file in public offices and to official certificates of the same, and it should not be understood to be a repeal of the notarial tariff.

Notwithstanding the general character of section 11 of General Order No. 150, it should be applied only to official copies of documents on file in public offices and official certificates to the same and not to copies and certificates issued by notaries; and this being so and it being clearly stated that notwithstanding the wording of section 2 of General Order No. 150 it is not applicable to notarial documents, we may also infer that section 1 is not applicable to such documents and that if it were, it would be applicable only to the public record which the notary might have in his possession, if any.

And it cannot be contended that by the construction given to section 1 of General Order No. 150 it would be inoperative as to notaries if they kept no records on file, for it would have no effect also as to the records of magistrates, for the courts and not magistrates keep the records and section 1 of General Order No. 150 provides that hereafter the records of all courts shall be open to the inspection of the public during office hours.

For the foregoing reasons the order appealed from should be

*Reversed.*

Mr. Justice Wolf concurred.

Mr. Justice Hutchison concurred in the result.

Mr. Justice del Toro dissented.

Mr. Justice Aldrey took no part in the decision.

### CONCURRING OPINION OF MR. JUSTICE HUTCHISON.

This case fell to me in the regular order of assignment. My report thereon was not entirely satisfactory to a majority of the court. Without criticism of the very able majority opinion, I prefer to rest my decision primarily upon the ground given in reporting on the case. I am authorized to state that Mr. Justice Wolf concurs not only in the opinion of the court, but also in the main considerations of the memorandum originally submitted. It follows:

The petitioner (appellee) demanded of respondent (appellant), a notary public, permission to inspect and examine an original notarial instrument, an open will executed by Doña Isabel Márquez y Crosas on November 2, 1914, No. 163 of the protocol.

The appellant, respondent below, refused to consent to such examination, and the District Court of San Juan, at the instance of the petitioner (appellee), issued a writ of mandamus, the sole question involved herein being, as fairly stated by appellant in his brief, "whether or not a person who does not allege an interest in a notarial instrument has the right to examine the same and whether the notary must consent to such examination."

Prior to the change of sovereignty the notarial profession in Porto Rico was governed by the Spanish Notarial Law, extended to Porto Rico by decree of October 29, 1873.

Articles 32 and 36 of that law provided among other things:

"Neither shall notaries permit any documents to be taken from their archives which are under their charge by reason of their office, nor shall they permit it or the protocol to be examined, in whole or in part, without a previous judicial decree, except by the interested persons who have an acquired right, or their heirs or legal representatives. However, in the cases determined by law and by virtue

of a judicial mandate they shall exhibit in their archives the protocol or protocols, in order to attend by virtue thereof to the proceedings that may have been agreed upon.

"Art. 36.—The protocols are the property of the State. Notaries shall keep them, in accordance with the laws, as archivists thereof, and under their responsibility."

The general notarial regulations, also previously in force in Porto Rico, provided in article 47 thereof that "as a general rule all protocols are secret."

The primary purpose and intention of the law to protect the private and confidential character of the contractual relation from the idle and irresponsible curiosity as well as the vicious and designing investigation of any and all persons having no legitimate interest in, and consequent right to be informed as to the subject-matter of, the notarial instrument is at once apparent. Although the protocol is declared to be public property, yet the sanctity of its contents is clearly recognized and securely safeguarded. All access is emphatically denied to those whose interest or right does not appear either from the nature and terms of the instrument or from a judicial decree.

The code, in section 675, corresponding to article 667 of the Spanish code, defines a will as "the act by which a person disposes of all his property, or a part of it, to take effect after his death." It is "absolutely a personal act" and its provisions "are essentially revocable." Sections 678 and 727, Spanish 670 and 737. Section 682 of our code, equivalent to article 674 of the Spanish code, provides that "a person who by deceit, fraud, or violence prevents another person of whom he is the intestate heir from unrestrictedly executing his last will shall be deprived of his right to the inheritance without prejudice to the criminal liability he may have incurred." And section 665, Spanish 657, says that "the rights to the succession of a person are transmitted from the moment of his death."

Publication of the contents of a will during the lifetime of the testator plainly was not contemplated by the framers of the code. That the same considerations underlying the jealous regard of the notarial law for the right of privacy in matters of contract apply *a fortiori* to the case of a last will and testament, is also quite clear.

During the period of military government in Porto Rico immediately following the change of sovereignty the following General Orders were promulgated:

No. 11, of January 29, 1899, reducing the schedules for notarial fees, abolishing certain items and continuing in force certain others, including Nos. 16 and 17 covering charges for copies of original instruments.

No. 150, of September 26, 1899, providing:

"I. Hereafter the records of all courts, magistrates, notaries, registrars, municipalities, and other public offices, shall be open to the inspection of the public during office hours.

"II. All officers or custodians in charge of such records shall furnish officially certified copies thereof to any person who may make application therefor upon payment of the following fees:

American currency.

"For each folio of transcript of a record_____ $0.15
"For each official certification of a transcript_____ .25"

No. 177, of November 11, 1899, explanatory of No. 150, *supra,* providing that—

"The word 'records' as used in General Orders, No. 150, current series, these headquarters, and translated in the Spanish copy as '*archivos,*' is intended to include all documents (*expedientes*) of every character which are connected with or relate to any case of record whether concluded or still pending."

No. 198, of December 2, 1899, providing:

"I. The fees collected for transcripts of official records and official certificates of such transcripts, provided for in Paragraph II, General Orders, No. 150, current series, these headquarters, and Paragraphs II and XXI, General Orders, No. 176, current series, these headquarters, shall be evidenced by revenue stamps, which shall be securely fixed to each document so certified   *   *   *."

No. 8, of January 16, 1900, providing:

"The provisions of General Orders, No. 150, as amended by General Orders, No. 177 and General Orders, No. 198, series of 1899, these headquarters, are intended to apply only to official copies of documents on file in public offices, as therein indicated, and to official certificates of the same, and are not to be construed as a revocation of the existing notarial tariff as modified by General Orders, No. 11, series of 1899, these headquarters, and as published in the Official Gazette of February 1, 1899."

Any serious and sustained effort to evolve a plausible theory or to reach a definite, stable and satisfactory conclusion as to the true significance, real purpose and net result of the military orders mentioned, and especially of Nos. 150 of 1899 and 8 of 1900, considering each as a whole in the light of the other and both with special reference to the legal effect, if any, upon section 32 of the Notarial Law, is not conducive to the serene state of mind that should characterize all judicial deliberation. Appellant argues that the words "records of all * * * notaries" do not refer to the notarial protocol, but "are evidently employed with reference to the record kept by notaries in the United States, where the protocol as it exists in Porto Rico is unknown." The last-mentioned suggestion, indicating as it does a vigorous but overtaxed imagination, merely illustrates the extreme difficulty of explaining the language in question upon any theory that eliminates the notarial protocol.

On the other hand, it is self-evident that if by "the records of all * * * notaries," in Paragraph I, reference is made to protocols, then the words "such records," in Paragraph II, likewise necessarily include such protocols; and, conversely, if "such records" do not include protocols, then "the records of all * * * notaries," *supra,* must inevitably refer either to something other than notarial protocols or else be eliminated altogether as absolutely meaningless. Yet, if General Order No. 8 means anything at all, we are told in substance that Paragraph II of General Order No.

150 has no reference whatever to notarial protocols. Nor is the language limited to the second paragraph of such previous General Order, but reference is made in the broadest terms to "The provisions of General Orders No. 150," etc. If in 1900 any notary had complained to the commanding officer that some misguided individual having misinterpreted General Order 150, as amended, to operate the repeal of section 32 of the Notarial Law, was demanding access to the original last will and testament of a testator not yet deceased and was likely to be sustained by the court in his efforts to violate the sanctity of such instrument, a further explanatory order might in such event, and it seems fairly reasonable to conclude would have issued forthwith explaining, after mention of previous orders, that "as therein indicated" no reference whatever to notarial protocols was ever at any time intended. And, however this may be, the fundamental principle underlying the rule of *noscitur a sociis* would seem to apply in a broad sense and to support a similar and more or less logical conclusion.

But the decision of this case does not necessarily hinge upon the question of a repeal of section 32 of the Notarial Law by General Order No. 150, and for the purposes of this opinion we might very well, but do not, concede that the district court did not err in its ruling upon this feature of the case.

An Act to regulate the introduction of evidence in civil proceedings, approved March 9, 1905, and cited by the trial judge in support of the conclusions reached by him, provides:

"Section 44.—Written documents are of two kinds:

"1. Public; and

"2. Private.

"Section 45.—Public documents are such as are specified in section 1184 of the Civil Code.

"Section 46.—All other writings are private.

"Section 47.—Every citizen has a right to inspect and take a copy of any public document of Porto Rico, *except as otherwise expressly provided by law.*

"Section 48.—Every public officer having the custody of a public document is bound to give him, on demand, a certified copy of it on payment of the legal fees therefor, and such copy is admissible as evidence in like cases and with like effect as the original writing.

"Section 49.—Public documents are divided into four classes:

"1. Laws.

"2. Judicial records.

"3. Other official documents.

"4. Public records kept in Porto Rico, of public or private documents."

An Act to regulate the practice of the notarial profession in Porto Rico, approved March 8, 1906, contains the following provisions:

"Section 6.—Notaries shall draft original deeds, issue copies thereof, and form their respective protocols.

"Section 25.—Upon issuing a copy, the fact shall be recorded in a memorandum placed at the foot or in the margin of the original document from which it is taken, wherein shall be stated the name of person to whom issued and date of issuance thereof. Said memorandum shall be signed by the notary.

"Section 34.—Protocols are the property of The People of Porto Rico but they shall be kept in the custody of notaries who shall be responsible for their care and preservation, under the provisions of this Act.

"Section 38.—The judges of the district courts shall visit at least once a year the notarial offices within their districts, for the purpose of examining the protocols and ascertaining whether they are kept in accordance with law. The judges of the district courts may impose a disciplinary fine not to exceed five hundred dollars ($500), for any fault that may have been detected; provided said fault does not constitute a crime, in which case the proper action shall immediately be instituted.

"Section 41.—The Notarial Law and its regulations are hereby repealed. And all other laws, orders and decrees in conflict herewith are also hereby repealed."

It may be noted that the definition of public documents contained in the Law of Evidence is not a new one. Previ- ·

ously, as now, articles 1216 and 1217 of the Spanish Civil Code, corresponding to sections 1184 and 1185 of our own, defined as public instruments those authenticated by a notary or by a competent public official and provided that when executed before a notary they should be governed by the Notarial Law. There is also a certain distinction to be drawn between the public instruments of the Notarial Law and of the Civil Code and the sense in which the word "public" is perhaps more frequently used. The words "public" and "private," as applied to instruments, do not necessarily imply publicity as contradistinguished from privacy. Scaevola, volume 20, page 208. We need not, however, and do not, rest our decision upon any such distinction. Whatever effect the Law of Evidence, upon which some stress is laid by the court below, might otherwise have had upon section 32 of the Notarial Law is wholly destroyed by the saving clause contained in section 47, inasmuch as in the said section 32 it is "otherwise expressly provided by law."

But section 32 was unquestionably repealed together with the rest of the Notarial Law and the regulations by section 422 of the Act of 1906. Thus from 1906 until 1914, at least, the right of inspection might have been urged with some degree of plausibility. But it does not necessarily follow, and we do not mean to say, that even during such period the notarial protocols were openly and unreservedly exposed to the inspection of every citizen. That, however, is also foreign to the issue.

In 1914 sections 25 and 38 of the law of 1906, *supra,* were amended to read as follows:

"Section 25.—*The parties, their ancestors,* (authors) *and successors in the subject matter of the contract and any person appearing as interested therein, may apply to and obtain from the notary copies of the original documents. Any other person may also obtain copies of a notarial document upon justified application to a district court, which in its reasonable discretion may issue an order to that effect.* (Italics ours; "authors" interpolated.)

"Upon issuing a copy, the fact shall be recorded in a memorandum placed at the foot or in the margin of the original document from which it is taken, wherein shall be stated the name of the person to whom issued and the date of issuance thereof. Said memorandum shall be signed by the notary.

"Section 38.—That the judges of the district courts shall visit at least once a year the notarial offices within their districts, for the purpose of examining the protocols and ascertaining whether they are kept in accordance with law, and in compliance with the provisions of the present law. The judges of the district courts may impose a disciplinary fine not to exceed five hundred dollars ($500) for any fault that they may detect, provided said fault does not constitute a crime, in which case the proper action shall be immediately instituted. *No other officer shall have authority to investigate or examine the notarial protocols, unless he is duly authorized by a warrant issued by a court of justice.*" (Italics ours.)

That the only appreciable changes made consist in the new paragraph inserted in section 25 and the final sentence appended to section 38 is quite obvious. A careful comparison of the new matter thus added with the repealed article 32 of the Spanish Notarial Law points directly to the inevitable conclusion that the Legislature intended either to supply an inadvertent omission to include the latter among other features of the former law, preserved and continued in force in more or less modified form in the acts above mentioned and other legislation, or, in any event, to re-establish the principle embodied in the language of that article. The amendment to section 25, at least, cannot be satisfactorily explained upon any other theory. *Expressio unius est exclusio alterius.* The new paragraph plainly means a restoration in substance of the old article or it means nothing. It could have no other purpose.

The judgment of the district court must be reversed.